**IT IS ORDERED as set forth below:**

**Date: September 29, 2017**

_____

**Barbara Ellis-Monro**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | |
| CLIFFORD EDWARD BURNLEY, and CHRISTINE ANNETTE BURNLEY, | CASE NO. 16-56433-BEM |
| Debtors. | CHAPTER 7 |
| BROOKFIELD GLOBAL RELOCATION SERVICES, LLC, Plaintiff, | |
| v. | ADVERSARY PROCEEDING NO. 16-5153-BEM |
| CLIFFORD EDWARD BURNLEY, and CHRISTINE ANNETTE BURNLEY, Defendants. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for a trial on June 20, 2017 (the "Trial"). Greg

Taube appeared on behalf of Brookfield Global Relocation Services, LLC ("Plaintiff") and

Clifford Burnley and Christine Burnley (collectively, "Defendants") appeared *pro se*.[1] Having considered the testimony of Deborah Kelly, Mr. Burnley and Mrs. Burnley, the documentary evidence and applicable legal authorities, the Court now enters its findings of facts and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

### I.    Jurisdiction

This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) and (J). The Court has jurisdiction pursuant to 28 U.S.C. § 1334(b).

### II.    Findings of Fact

Plaintiff is a third-party relocation service provider contracted by employers to assist in relocating designated employees. [June 20, 2017 Trial Recording at 10:17:39-10:17:54].[2] In November 2014, CSX, Mr. Burnley's employer at the time, hired Plaintiff to assist with Defendants' relocation from Ohio to Florida. Mr. Burnley owned the Defendants' residence in Ohio (the "Property"). The Property was subject to a mortgage held by Wells Fargo Bank, N.A. (the "Ohio Mortgage"). [P. Ex. 17]. Mr. Burnley testified that he did not have to sell the Property to Plaintiff because there were other options but he wanted to sell the Property so he could buy a house in Florida.

Plaintiff began assisting with Defendants' relocation on November 6, 2014. In conjunction therewith Plaintiff ordered a title report on the Property from First American Title Insurance Company (the "November Title Report") and sent Mr. Burnley a Homeowner Disclosure Statement, [Plaintiff's Exhibits 18 and 1] (hereinafter Plaintiff's Exhibits will be referred to as "P. Ex. __"]. Defendants completed the Homeowner Disclosure Statement on

---

[1] Defendants were previously represented by counsel. The Court entered an order granting their former counsel's Motion to Withdraw on January 4, 2017. [Doc. 18].

[2] References to the Trial recording are referred to as [TR time code].

November 14, 2014 (the "Disclosures"). [P. Ex. 1]. The November Title Report reflects that the Property is subject to the Ohio Mortgage.

Deborah Kelly Farina ("Ms. Kelly") has been employed in Plaintiff's legal department for 23 years. Ms. Kelly testified that Plaintiff's contract with its employer-clients requires that the Homeowner Disclosure Statement be completed in all of its transactions. Ms. Kelly testified further that Plaintiff uses and relies upon the information provided in the Homeowner Disclosure Statement.

Mr. Burnley testified that he "absolutely" wanted to move to Florida. Mrs. Burnley testified that she wanted to help sell the Property and move to Florida.

**The Contract**

On January 10 and 11, 2015, Mr. Burnley and Mrs. Burnley, respectively, read[3] and executed a contract of sale in favor of Plaintiff (the "Contract"). [P. Ex. 4]. The Contract provided for Defendants to transfer the Property to Plaintiff and for Plaintiff to satisfy the Ohio Mortgage and pay closing expenses. [P. Ex. 4].

Ms. Kelly testified that the representations and warranties contained in the Contract are "very typical and usual" for employees receiving the relocation benefit offered by their employer and all relocating employees agree to these type of representations. Ms. Kelly testified further that because Plaintiff provides services which constitute an employee relocation benefit, Plaintiff does not buy title insurance but relies on the representations and warranties in the contract for sale because matters not of record often affect title, such as encroachments, litigation or divorce. She also stated that Plaintiff usually has not received a title report prior to the effective date of the contract and relies on the representations and warranties when

---

[3]Mrs. Burnley testified that she did not really read the Contract before she signed it. However nothing prevented her from reading it and she understood that it was for the sale of the Property. [TR 12:08:03-12:08:20].

3

purchasing employees' properties.  She testified further that the representations and warranties provide some protection to the employer in the event of a misrepresentation.

Seller's representations and warranties are contained in ¶ 10 of the Contract, which provides in relevant part:

> Seller covenants, represents and warrants that: …
>
> c. Seller has no knowledge of any actual or contemplated condemnation, urban renewal or eminent domain or similar proceedings or of any assessment of levy affecting the Premises;
> d. Seller has disclosed to Brookfield GRS all information regarding the physical condition of the Premises of which Seller has knowledge and Seller has not misstated or omitted any material fact with regard to any condition affecting the Premises that, if known, would affect the value of the Premises;
> …
> l. After executing this Agreement Seller will not permit to exist any additional lien or encumbrance against the Premises; …
> n. To the best of Seller's knowledge: (i) Seller holds fee simple title to the Premises and has the right to convey the Premises, and (ii) title to the Premises is free and clear of all encumbrances, except for those encumbrances disclosed by the title search obtained by Brookfield GRS ("Known Encumbrances"). Seller will warrant and defend the title to the Premises (except for the Known Encumbrances) against the claims of all persons claiming by or through Seller.
>
> All of the foregoing covenants, representations, and warranties are true as of the Effective Date and as of the Vacate Date.

(collectively the "Representations") [P. Ex. 4].

Ms. Kelly testified that Plaintiff generally expects honesty in the representations and warranties  and full disclosure of items affecting the title to property, such as judgments and liens. She testified further that Plaintiff specifically relied on Defendants' Representations in executing the Contract and in obtaining certain exceptions to the employer's policy on moving household goods to allow for additional crating and moving items such as bunk beds, a dining room set and aquariums. In addition, and in reliance on the Representations, Plaintiff ordered a

title report and had a radon inspection done on the Property. Finally, Plaintiff further relied on the Representations when it paid the Ohio Mortgage.[4]

The Contract provides for a "Vacate Date" of no later than February 23, 2015, and Defendants were "packed and loaded" between February 16 and 19, 2015.  The Effective Date is the "date [the Contract] is signed by Brookfield GRS," which occurred on March 6, 2015, when Kyle Gustafson of Brookfield GRS signed the Contract on Plaintiff's behalf. [P. Ex. 4; TR 10:24:51-10:25:14]. Defendants do not dispute that a judgment lien arose on January 27, 2015, after they executed the Contract but before the Vacate Date and the Effective Date.

### The Litigation

It is undisputed that when Plaintiff paid the Ohio Mortgage it was not aware of litigation against Mr. Burnley that had been pending since November 15, 2013 (the "Litigation").[5] Marc Dann represented Mr. Burnley in the Litigation until February 13, 2015. [P. Ex. 9].  Cadlerock Joint Venture, LP ("Cadlerock"), plaintiff in the Litigation, obtained a judgment on its motion for summary judgment on December 22, 2014 (the "Judgment"), in the Common Pleas Court for Huron County, Ohio (the "Huron Court"). [P. Ex. 3].  The Judgment, in the amount of $89,948.18 plus interest of 12.8% per annum, reflects that Cadlerock filed its Motion for Summary Judgment on May 15, 2014, and that the Huron Court held a hearing on the motion on August 27, 2014. *Id.* At some point after entry of the Judgment and prior to Mr.

---

[4] The Contract contains a purchase price of $225,000 for the Property. The amount owed on the Ohio Mortgage exceeded the purchase price and CSX provided Mr. Burnley with $10,000 to pay toward  satisfying the Ohio Mortgage.
[5] The Litigation related to the payment of a second mortgage on a piece of property previously owned by Mr. Burnley that had been foreclosed by the first mortgage holder. The plaintiff in the Litigation sought to collect on an obligation originated by South Star Funding. Defendants argued that the plaintiff was not the holder of the debt and did not have standing to seek to collect the same.

Dann's withdrawal from the Litigation, Defendants appealed. The appeal was resolved in Cadlerock's favor, although the precise date of resolution is unclear.[7]

On January 26, 2015, Cadlerock filed a precipe with the clerk of the Huron Court requesting that the clerk issue and file a certificate of the Judgment. [P. Ex. 6]. The next day, on January 27, 2015, a certificate of the Judgment was issued and filed with the clerk, creating a judgment lien in favor of Cadlerock (the "Lien"). [P. Ex. 19].[8]

On February 3, 2015, after considering Mr. Burnley's "Combined Motion to Stay Execution of Judgement and for Waiver of Supersedeas Bond" (the "Supersedeas Motion"), the Huron Court entered an order setting a bond in the Litigation (the "Supersedeas Order"). [P. Ex. 7]. The Supersedeas Order states in part that "the judgment in this case may be stayed pending appeal upon the posting of a Supersedeas Bond of Nine Thousand Five Hundred Dollars ($9,500.00) on or before February 13, 2015. If not posted by that date, there will be no stay." *Id.* Defendants did not post the bond and did not inform Plaintiff of the Supersedeas Order.

Mrs. Burnley conducted legal research and drafted motions and pleadings on behalf of Mr. Burnley in the Litigation and on behalf of Defendants in this adversary proceeding. On February 11, 2015, Mr. Burnley filed a Motion to Vacate Judgment in the Litigation (the "Motion to Vacate") drafted by Mrs. Burnley. Through the Motion to Vacate, Defendants sought:

> relief from the erroneous summary judgement entered against them, and an injunction against any collection activities by the Plaintiff under the Ohio Consumer Sales Practices Act (OCSPA). The Plaintiff has filed for a property lien

---

[7]Mr. Burnley testified he thought the appeal was still pending, and when questioned on whether the Judgment had been affirmed, he stated he did not think so. [TR 11:31:40-11:32:04]. Mrs. Burnley, however, admitted that the appeal had not been successful.  [TR 12:16:29-12:16:49].

[8] Section 2329.02 of the Ohio Revised Code provides, in part, that "[a]ny judgment or decree entered by any court of general jurisdiction . . . within this state shall be a lien upon lands and tenements of each judgment debtor within any county of this state from the time there is filed in the office of the clerk of the court of common pleas of such county a certificate of such judgment …." Ohio Rev. Code Ann. § 2320.02.

against the Defendant. The Defendant is requesting that the court deny the
Plaintiff this lien, or at least deny it until the end of a fair and equitable trial.

[P. Ex. 8]. Both Mr. Burnley and Mrs. Burnley testified that Mr. Dann advised that any lien that

resulted from the Litigation would be unsecured. Mr. Burnley testified that Defendants relied on

this even after they filed the Motion to Vacate and terminated their relationship with Mr. Dann,

but he also stated that at some point after Mr. Dann's representation ceased that they "had to

educate [them]selves" about liens. [TR 11:41:35-11:42:45]. Mrs. Burnley testified that she did

"what [she] could" in terms of researching the law when drafting the various pleadings she

prepared." [TR 12:04:10-12:04:14].

After filing the Motion to Vacate, Defendants on February 24, 2015, filed a

Response to Plaintiff's Memorandum in Opposition to Defendant's Motion to Vacate and then,

on March 1, 2015, Defendants filed a Further Memorandum in Support of Motion to Vacate

Judgement. [P. Ex. 11, 12]. Attached to that memorandum is a letter dated February 25, 2015,

from Cadlerock to Mr. Burnley that states, in part,

> I am writing in response to your letter addressed to Cadlerock Joint Venture, L.P.
> dated February 13, 2015.  Cadlerock believes that it has not taken any actions in
> violation of the Ohio Consumer Sales Practices Act and/or the Fair Debt
> Collection Practices Act. Therefore, Cadlerock will not, at this time, agree to
> vacate the underlying judgment or remove the judgment lien.

[P. Ex. 12]. At some point the Huron Court struck the Motion to Vacate. [P. Ex. 8].  Mrs.

Burnley testified that this was because the Huron Court no longer had jurisdiction since the

appeal was pending. The Huron Court's statement striking the Motion to Vacate does not set

forth a reason for striking the pleading; it merely refers back to the "Judgment Entry filed 03-02-

2015." *Id.*

**<u>Knowledge of the Lien</u>**

Plaintiff first learned of the Litigation and the Lien on or about April 15, 2015, when it received a title report effective April 1, 2015. Defendants acknowledge that it was not until Mr. Gustafson, the signatory on the Contract for Plaintiff, called Mr. Burnley and asked about the Lien that Defendants provided any information regarding the Litigation to Plaintiff. Mr. Burnley testified that he did not tell Plaintiff about the Litigation or the Judgment because there was not a lien when he signed the Contract, he did not think that there would be a lien, and he did not think it would be an issue. [TR 11:42:50-11:43:05].

Mr. Burnley testified that there was a Lien on the Property after he signed the Contract, but that he did not learn of it until April 15, 2015; that based on Mr. Dann's advice he believed the Lien was an "unsecured lien" that could not attach to any property; and that Defendants were "trying to prevent [Cadlerock] from filing for a lien" when they filed the Motion to Vacate, the appeal, and the various postjudgment pleadings filed in the Litigation. [TR 11:09:00-11:09:14; 11:18:24-11:19:04]. Mr. Burnley testified further that he did not know that Cadlerock had done anything or that there was a lien until Mr. Gustafson called him but that Defendants knew of the potential for a lien, which they wanted to avoid because they were moving. [TR 11:20:34-11:21:01]. When confronted with the portion of the Motion to Vacate that states that Cadlerock had filed for a lien, Mr. Burnley conceded that it was "possible" he knew Cadlerock had filed for a lien. [TR 11:27:34-11:27:44]. Mr. Burnley believes the Judgment was wrongly decided and that Cadlerock does not have the right to collect its claim against him. With respect to the Disclosures, Mr. Burnley testified that he checked the "no" box in response to the question, "Are there any existing or potential legal actions affecting the property?" in the Disclosures because he "was not required" to disclose the Litigation. [TR 11:05:04-11:05:10].

Mrs. Burnley testified that she understood the Lien was unsecured and that the Motion to Vacate was trying to prevent a lien on any property. She testified further that she did not know what property the lien could affect. Mrs. Burnley also stated that she did not understand the effect of the Huron Court's striking the Motion to Vacate. Mrs. Burnley has an undergraduate degree in criminal justice and a master's degree in business. Mr. Burnley also has an undergraduate degree.

Once aware of the Lien, Plaintiff contacted Mr. Burnley to determine what had happened and then worked with the title company to determine  if it could remove the Lien without having to pay Cadlerock the amount of the Judgment. Ms. Kelly testified that Plaintiff attempted to clear the Lien but ended up having to pay Cadlerock $77,000 to remove the Lien from the Property. [P. Ex. 16].  In addition, Ms. Kelly testified that Plaintiff typically addresses this type of issue directly with the home seller. She also testified that had Plaintiff been aware of the Lien before March 6, 2015, Plaintiff likely would not have paid the Ohio Mortgage. Given the amount of the Judgment, she testified, the only way to go forward with the purchase would have been to address a resolution with Defendants and CSX. [TR 10:36:10-10:37:20].

## III.    Conclusions of Law

Plaintiff argues that the timing of events and Defendants' actions in the Litigation make clear that Defendants made knowing misrepresentations to Plaintiff in the Disclosures and Contract and that, at a minimum, Defendants acted in reckless disregard of the truth  in failing to disclose the Litigation, the Judgment, and the Lien. Plaintiff argues further that Defendants' changing their testimony when faced with contradictory evidence  constitutes evidence of the knowing and fraudulent nature of Defendants' actions.

Defendants argue that Plaintiff failed to comply with the notice requirements of the Contract and thus are not entitled to enforce the Contract. Defendants argue further that Mrs. Burnley did not receive any consideration under the Contract because she did not have an ownership interest in the Property, was not obligated on the Ohio Mortgage, and was not subject to the Judgment and thus, Mrs. Burnley did not receive money, property or credit from Plaintiff as required by 11 U.S.C. § 523(a)(2)(A). Defendants also argue that Plaintiff failed to prove reliance on the Representations in the Contract or, if it did, its reliance was unjustified.

Having considered the documentary evidence and witness testimony, the Court concludes that Plaintiff failed to prove by a preponderance of the evidence that Defendants with fraudulent intent either made affirmative false representations or concealed material facts that Defendants had a duty to disclose to Plaintiff. The debt owed to Plaintiff, therefore, is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). The Court further concludes that the evidence does not support a claim under 11 U.S.C. § 523(a)(6) or § 727(a)(4)(A).

A.    **Underlying Claim**

Here, because Plaintiff's claim is unliquidated, the Court must first determine whether Plaintiff has a claim against Defendants; if it does, the Court must then determine whether it is dischargeable. *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (B.A.P. 10th Cir. 2016). The Contract is governed by Ohio law. [P. Ex. 4] [Doc. 45]. Under Ohio law the party claiming breach has the burden to establish by a preponderance of the evidence that (i) a contract existed, (ii) plaintiff fulfilled his obligations, (iii) defendant failed to fulfill his obligations, and (iv) damages resulted from this failure. *Circuit Sol., Inc. v Mueller Elec. Co.*, No. 05CA008775, 2006 Ohio App. LEXIS 4257, at *4 (Aug. 21, 2006) (citing *Lawrence v. Lorain Cty. Cmty Coll.*, 713 N.E.2d 478, 480 (Ohio Ct. App. 1998)).

The evidence showed that Plaintiff and Defendants entered into the Contract effective on March 6, 2015, and that Plaintiff paid the entire contractual purchase price. The evidence also showed that the amount of the Ohio Mortgage exceeded the Property's value; that Plaintiff paid the vast majority of the Ohio Mortgage;  that CSX provided $10,000 to pay the remainder of the Ohio Mortgage; that Plaintiff provided moving services to Defendants which included obtaining additional authorization from CSX to crate and transport delicate and expensive items; that upon learning of the Lien on April 15, 2015, Plaintiff's representative called Mr. Burnley to inquire about the Lien; that Defendants never paid the Judgment or otherwise satisfied the Lien; and that Plaintiffs, after a year of attempting to resolve the Lien, paid Cadlerock $77,000 to obtain a release of the Lien against the Property.

Defendants argue that because Plaintiff did not provide written notice of its discovery of the Lien, Plaintiff breached the Contract and cannot enforce it against Defendants. For this argument, Defendants rely on ¶ 9 of the Contract, which requires written notice of "title defects."   Paragraph 9, however, addresses cases of "[e]xisting covenants, conditions, restrictions, easements, rights of way and zoning ordinances … , provided that they are of the type customarily found on residential property in the community ...." and "[n]on-delinquent mortgages, taxes or assessments." It does not apply to undisclosed judgment liens.[10]

Paragraph 17 of the Contract—not ¶ 9—addresses undisclosed liens and inaccurate information. Paragraph 17 states,

> If any information Sellers have supplied to Brookfield GRS, the appraisers or any other person performing services in connection with this Agreement is incorrect or if any of Sellers' representations or warranties is inaccurate or if an error is made in computing equity or adjustment (as a result of erroneous information or

---

[10] The Court notes that it referred to this portion of the Contract's ¶ 9 in the Summary Judgment Order [Doc. 45] in concluding that an additional lien on the Property, regardless of type, is material under the Contract. The Court did not consider, as it now must, whether this section of the paragraph applied or whether the inaccuracy of the representations and warranties as of February 23 and March 6 is governed by other provisions of the Contract.

11

otherwise) Sellers and Brookfield GRS agree to make any financial adjustment necessary to reflect the intent of the Agreement and to promptly pay to the other party any amount determined to be due.

[P. Ex. 4]. Paragraph 10 provides that the representations and warranties regarding liens against the Property "are true as of the Effective Date and the Vacate Date." It is undisputed that the representation regarding the liens against the Property was inaccurate on each of these dates: the Lien arose on January 27, 2015; the Vacate Date was contractually no later than February 23, 2015; the Effective Date was March 6, 2015. Thus ¶ 17 of the Contract is the appropriate provision to apply in considering whether written notice was required. Paragraph 17 does not require written notice. Therefore, Plaintiff's telephone call to Mr. Burnley satisfied Plaintiff's contractual notice obligations.

But even assuming ¶ 9, rather than ¶ 17, applied to the situation at hand, Defendants provide no authority to support the broad contention that failure to strictly comply with such a written notice provision amounts to a waiver of defects. To the extent Plaintiff can be said to have "breached" the Contract by failing to strictly comply with the notice provision, such breach was clearly immaterial. Defendants have made it abundantly clear they never intended to satisfy the Lien or remunerate Plaintiff for having paid $77,000 to Cadlerock. Lack of written notice did not prejudice Defendants—the form of Plaintiff's notice is and has always been beside the point. *See Stonehenge Land Co. v. Beazer Homes Investments, LLC*, 893 N.E.2d 855, 864 (Ohio App. 2008) ("where there is evidence of actual notice, a technical deviation from a contractual notice requirement will not bar the action for breach of contract brought against a party that had actual notice")

Plaintiff provided services associated with purchasing the Property, services associated with packing and loading Defendants' household goods, and paid the entire

12

contractual purchase price for the Property. Consequently, the Court concludes that Plaintiff fulfilled its obligations under the Contract.

Mrs. Burnley argues that she did not receive any consideration under the Contract because she was not obligated on the Ohio Mortgage or the Judgment. The Court disagrees because consideration can take many forms and need not be equivalent. *Williams v. Ormby*, 966 N.E.2d 255, 259 (Ohio 2012). "Consideration may consist of either a detriment to the promisee or a benefit to the promisor. A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forbearance, loss, or responsibility given, suffered, or undertaken by the promisee." *Id.* (citation omitted) (citing *Irwin v. Lombard Univ.,* 46 N.E. 63, 65 (Ohio 1897)).

The record contains no evidence suggesting Plaintiff was willing to purchase the Property with only Mr. Burnley as the counterparty to the Contract. Presumably, Mrs. Burnley was a party to the Contract not as an unsolicited volunteer but on Plaintiff's insistence. In exchange, she received the benefit of selling her familial residence promptly and without the necessity of marketing the Property, freeing both Defendants to relocate with their children to Florida. This is sufficient consideration to support a contract. Thus, the Court concludes that Mrs. Burnley received consideration under the Contract and the Contract is enforceable as to both Defendants.

It is undisputed that Defendants did not pay Plaintiff the negative equity in the Property as required by the Contract. Consequently, Defendants failed to fulfill their obligations under the Contract.

Ms. Kelly testified that Plaintiff sought to resolve the Lien through various means, but that it took a year to resolve the Lien and required that Plaintiff pay $77,000 to Cadlerock to

obtain a release of the Lien against the Property.[11]  [P. Ex. 16, 20].  Ms. Kelly testified that given

the amount of the Lien, another solution (other than satisfying the Lien) would have had to have

been found and that, if Plaintiff had known about the Lien,  Plaintiff likely would not have

entered into the Contract.   Thus, Plaintiff has established an enforceable contract  with both

Defendants, that Plaintiff discharged its duties under the Contract, that Defendants breached the

Contract, and that Plaintiff suffered damages of $77,000 as a result of that breach.

Plaintiff having established a claim against Defendants, the Court will now

consider whether  the claim is excepted from discharge.

**B.      Legal Standards for Excepting a Debt From Discharge**

Plaintiff seeks a determination that the Contract debt is nondischargeable pursuant

to 11 U.S.C. § 523(a)(2)(A) or (a)(6). Alternatively, Plaintiff seeks  a denial of Defendants'

discharge under § 727(a)(4). A primary purpose of our bankruptcy system is a "fresh start" for

the honest but unfortunate debtor. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S. Ct. 695, 699

(1934); *Perez v. Campbell*, 402 U.S. 637, 648, 91 S. Ct. 1704, 1710-11 (1971). Courts liberally

construe exceptions to discharge in favor of the debtor to carry out the fresh start policy.

*Equitable Bank v. Miller* (*In re Miller*), 39 F.3d 301, 304 (11th Cir. 1994). Therefore, "[t]he

reasons for denying a discharge … must be real and substantial, not merely technical and

conjectural." *Id.* (internal quotation marks and citations omitted). The burden is on Plaintiff to

prove its case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290, 111 S.

Ct. 654, 661 (1991).

---

[11] The payment resulted in the Property being released from the Lien, but did not result in full satisfaction of the Judgment. [P. Ex. 20].

1.        **Nondischargeability Under 11 U.S.C. § 523(a)(2)(A)**

A chapter 7 discharge does not apply to a debt: "(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained, by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A). To prevail on a claim under § 523(a)(2)(A), Plaintiff must establish facts to show each of the following elements: "(1) the debtor made a false representation with the intention of deceiving the creditor; (2) the creditor relied on the false representation; (3) the reliance was justified; and (4) the creditor sustained a loss as a result of the false representation." *Taylor v. Wood (In re Wood)*, 245 F. App'x 916, 917-18 (11th Cir. 2007) (citing *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998)). "The debtor need not have received the money directly in order for a debt to be nondischargeable under § 523(a)(2)(A); rather the debtor need only have benefited from money obtained through false pretenses, a false representation, or actual fraud." *JTWO, LLC v. St. Hilaire (In re St. Hilaire)*, AP No. 12-5612, 2013 Bankr. LEXIS 4388, at *15-16 (Bankr. N.D. Ga. Sept. 24, 2013) (Ellis-Monro, J.).

Whether Defendants had the requisite deceptive intent is determined from Defendants' subjective intent at the time the representation is made, and may be inferred from the totality of the circumstances. *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010); *Sargis v. Aguilar (In re Aguilar)*, 511 B.R. 507, 512-13 (Bankr. N.D. Ill. 2014); *Andrews v. Chamblee (In re Chamblee)*, 510 B.R. 370, 378-79 (Bankr. N.D. Ala. 2014). Courts may infer the required intent to deceive from the facts and circumstances of the case, but "if there is room for an inference of honest intent, the question of nondischargeability must be resolved in the debtor's favor." *Advance Fin. Corp. v. Gross (In re Gross)*, AP No. 10-6065,

15

2011 Bankr. LEXIS 3273, at *21 (Bankr. N.D. Ga. June 9, 2011) (Sacca, J.) (citing *Bancorp S. Bank v. Callaway (In re Callaway)*, AP No. 05-1113, 2006 Bankr. LEXIS 3575, at *42 (Bankr. N.D. Ga. Nov. 28, 2006) (Drake, J.) (quoting *Fifth Third Bank v. Collier (In re Collier)*, 231 B.R. 618, 626 (Bankr. N.D. Ohio 1999)).

A "misrepresentation that is intentional or made with reckless indifference to the truth" constitutes false pretenses for purposes of § 523(a)(2)(A). *In re Wood*, 245 F. App'x at 918 (citation omitted); *see Birmingham Tr. Nat'l Bank. v. Case*, 755 F.2d 1474, 1476 (11th Cir. 1985).  A false representation contemplates an express misrepresentation while false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression. *Cochran v. Reath (In re Reath),* 368 B.R. 415, 421 (Bankr. D.N.J. 2006) (citing *Suntrust Bank v. Brandon (In re Brandon),* 297 B.R. 308, 313 (Bankr. S.D. Ga. 2002). "Although the conceptual boundaries between 'false pretenses' and 'false representation' may appear blurry, the two principles do lend themselves to distinction.  Specifically, a false representation is said to have occurred where the defendant has made an express, rather than an implied, misrepresentation." *Carlan v. Dover (In re Dover)*, 185 B.R. 85, 87 n.3 (Bankr. N.D. Ga. 1995) (citing *In re Schnore,* 13 B.R. 249, 251 (Bankr. W.D. Wis. 1981).

Plaintiff argues that Defendants' failure to disclose the Litigation in the Disclosures was an express misrepresentation. Plaintiff also argues that Defendants' failure to disclose the Judgment or the Lien were express misrepresentations knowingly made because the Contract provided that Defendants' "covenants, representations, and warranties are true as of the Effective Date and as of the Vacate Date." Plaintiff alternatively argues that at a minimum, Defendants' failure to disclose constituted misrepresentations made with reckless disregard of

the truth, given Defendants' knowledge of the Judgment, their inability to post the supersedeas bond, and their knowledge that Cadlerock had "filed for a property lien."

***Failure to Disclose Litigation***

It is undisputed that Defendants responded in the negative to question 6 of the Disclosures, which asked, "Are there any existing or potential legal actions affecting the property?" [P. Ex. 1]. Upon examination, Mr. Burnley testified that he was not required to disclose the Litigation in response to this question. No further explanation of this answer was sought or given.

Read broadly—as Plaintiff does—question 6 seeks disclosure of any legal action that could result in a personal judgment, even if a lawsuit has not yet been filed ("any existing *or potential* legal actions"), and even if the cause of action has nothing to do with the property to be sold. The Court is not inclined to construe question 6 in a way that essentially reads "affecting the property" out of the question, particularly without any evidence of the parties' intent regarding the question.

But even assuming question 6 is as broad as Plaintiff contends, the Court could not conclude that Defendants answered the question with fraudulent intent. The record contains no evidence that Defendants—as of November 2014, when the Disclosures were made—were aware that the Litigation could affect the Property. As of November 2014, no ruling had yet been made on the Motion for Summary Judgment in the Huron Court. The record in this case contains no direct evidence of Defendant's understanding, at that time, of the full legal implications of a potential personal judgment against Mr. Burnley—particularly, whether such a judgment could become a judgment lien encumbering the Property. Moreover, the events that occurred after the

Supersedeas Order and Defendants' inability to post a bond also indicate that Defendants had limited understanding of judgment liens when they completed the Disclosures.

For the foregoing reasons, the Court cannot conclude either that Defendants' answer to question 6 of the Disclosures was untrue when made or, even assuming the answer was untrue, that Defendants answered the question with fraudulent intent.

***Failure to Disclose Judgment or Lien***

The Contract included representations by Defendants that (1) title to the Property was free and clear of encumbrances except for those known by Plaintiff at the time and (2) Defendants would not permit any additional liens or encumbrances against the Property. The Contract also included a provision stating that Defendants' "covenants, representations, and warranties are true as of the Effective Date and as of the Vacate Date."

It is undisputed that the Lien did not encumber the Property when Defendants signed the Contract on January 10 and 11, 2015. Acknowledging this, Plaintiff argues that Defendants' representations, by contract, were continuous and made "as of" the Vacate Date (no later than February 23, 2015) and Effective Date (March 6, 2015). Because the representations as to liens and encumbrances were both made and false as of those dates, argues Plaintiff, those representations were express false representations. Plaintiff also makes a related argument that Defendants' failure to notify Plaintiff of the Lien constituted fraudulent concealment.

The theory underlying Plaintiff's arguments on this point presents a legal question and a factual question. The legal question is whether a "continuing representation" contract provision can turn a representation that was true when made into an express false representation, triggering a duty to speak or disclose. The factual question is, assuming the answer to the legal

question is yes, whether Defendants possessed the requisite fraudulent intent after the representations regarding liens and encumbrances were no longer true.

For the reasons set forth below, the Court concludes that for purposes of a § 523(a)(2)(A) cause of action, a continuing representation contract provision cannot render a representation that is true when made an express false representation or trigger an independent duty to disclose. Alternatively, the Court cannot find that Defendants possessed a fraudulent intent at any relevant date after the representations at issue became no longer true.

Plaintiff has provided no § 523(a)(2)(A) caselaw supporting the proposition that a true representation can become an express false representation by operation of a continuous-representation contract provision. Plaintiff likewise has provided no authority that a continuous-representation contract provision can trigger a duty to disclose such that failure to disclose can render a debt nondischargeable under § 523(a)(2)(A). Bankruptcy caselaw has generally limited the duty to disclose for purposes of § 523(a)(2)(A)  to situations involving  special relationship between the parties, such as a fiduciary relationship. *E.g.*, *Speedsportz, LLC v. Lieben (In re Lieben)*, No. 11-77399-JRS, 2013 WL 5183503, at *6 (Bankr. N.D. Ga. Aug. 21, 2013) (Sacca, J.) (duty to disclose arises "when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them"); *see also Telmark, LLC v. Booher (In re Booher)*, 284 B.R. 191, 205 (Bankr. W.D. Pa. 2002) ("a mere contractual duty to disclose cannot, without more, serve to create the type of relationship that is required").  Given the Court's obligation to liberally construe exceptions to discharge in favor of debtors, and given the lack of legal authority provided to the Court, the Court cannot conclude that the continuous-representation provision at issue resulted in an express false representation or created an independent duty to disclose for purposes of § 523(a)(2)(A).

Alternatively, as further explained below, the Court cannot find by a preponderance of the evidence that Defendants possessed a fraudulent intent in failing to notify Plaintiff about the Lien. The Court cannot confidently conclude one way or the other what Defendants knew and understood about the Lien, and when they knew and understood it. Plaintiff, therefore, has not satisfied the burden of proof required by § 523.

As previously stated, the record contains no direct evidence of Defendants' understanding, as of November 2014, of the full legal implications of a potential personal judgment against Mr. Burnley, including whether such a judgment could become a judgment lien encumbering the Property. The record is similarly devoid of direct evidence (aside from Defendants' own testimony) of Defendants' understanding at various key points—when the Judgment was entered on December 22, 2014; when Defendants signed the Contract on January 10 and 11, 2015; when the Judgment became a judgment lien on January 26, 2015; and up until February 2015. The events that occurred after the February 3, 2015, Supersedeas Order and Defendants' inability to post a bond indicate that Defendants generally had limited understanding of judgment liens

The Supersedeas Order states that unless Defendants posted the bond, Cadlerock could begin collection activity. Defendants knew they could not post the bond and thus knew that, as of February 13, 2015, Cadlerock could begin collection activity. Defendants', presumably in an attempt to forestall collection, filed the Motion to Vacate on February 11, 2015, and sent a letter to Cadlerock alleging violations of the Fair Debt Collection Practices Act and the Ohio Consumer Sales Practices Act. [P. Ex. 12]. The Motion to Vacate provides additional insight into Defendants' knowledge after entry of the Judgment and the February 3, 2015, Supersedeas Order. Defendants sought, through the Motion to Vacate,

> relief from the erroneous summary judgement entered against them, and an injunction against any collection activities by the Plaintiff under the Ohio Consumer Sales Practices Act (OCSPA). *The Plaintiff has filed for a property lien against the Defendant. The Defendant is requesting that the court deny the Plaintiff this lien, or at least deny it until the end of a fair and equitable trial.*

[P. Ex. 8] (emphasis added).  Shortly thereafter, on February 24, 2015, after Defendants had moved to Florida, Mrs. Burnley drafted and Mr. Burnley filed "Defendant's Response to Plaintiff's Memorandum in Opposition to Defendants' Motion to Vacate" (the "Response"). In the Response, Defendants argue that the Huron Court erred in entering the Judgment and also that Cadlerock violated the Fair Debt Collection Practices Act and the Ohio Consumer Sales Protection Act. [P. Ex. 11].  Similarly, in a Further Memorandum in Support of Motion to Vacate Judgment for Violations of OSCPA and FDCP (the "Memorandum") filed March 1, 2015, Defendants argued that "Plaintiff [Cadlerock] h*as used this erroneous Summary Judgment to file for a property lien against the Defendant.*" [P. Ex. 12] (emphasis added).  Defendants also noted that "[t]he Defendant requested an injunction in his Motion to vacate, filed on 2/11/15, against the Plaintiffs' debt collection activities." *Id.* Defendants attached a letter, dated February 25, 2015, to the Memorandum (the "Letter"). The Letter indicates that on February 13, 2015, the last day to post the supersedeas bond, Mr. Burnley wrote to Cadlerock and asserted that Cadlerock was violating the Fair Debt Collection Practices Act and the Ohio Consumer Sales Protection Act.  The Letter states, in part, that it is in response to Mr. Burnley's letter and that "Cadlerock will not, at this time, agree to vacate the underlying judgment or *remove the judgment lien*." [P. Ex. 11] (emphasis added). The February 13 is not part of the record such that it is not known whether the letter refers to a judgment lien.

In this proceeding, Mr. Burnley testified that he first learned of the Lien when Mr. Gustafson called him on or about April 15, 2015. That testimony is undermined by the Letter and

the Memorandum. Defendants were clearly aware of, at a minimum, the potential for a lien as of February 11, 2015, when Mr. Burnley filed the Motion to Vacate referring to Cadlerock having "filed for a property lien" and requesting "that the court deny the Plaintiff this lien." The Memorandum, filed March 1, 2015, likewise refers to Cadlerock having "filed for a property lien."

A natural reading of those documents, however, is that Defendants wanted to prevent Cadlerock's attempt to obtain a judgment lien, unaware that the Judgment had already become a lien. Given the lack of other direct evidence, and given laypeople such as Defendants typically do not fully understand the implications of judgments and judgment liens, the Court cannot conclude based on the documentary evidence that Defendants knew at any relevant point that the Judgment had become a judgment lien and that the Lien encumbered the Property.

Defendants' testimony confirmed a general ignorance about judgments and liens. When pressed on cross examination, Mr. Burnley testified that he did not know what filing for a lien meant while Mrs. Burnley testified that she did not know what property would be affected by the lien. Mrs. Burnley testified that through the post-Judgment pleadings she sought to stop the lien from affecting any property.[13] Mr. Burnley testified that Defendants did not research liens while they were being advised by Mr. Dann but that at some point in time they "had to educate [them]selves." [TR 11:41:23-11:42:31]. Mrs. Burnley testified that "to the extent she could" she conducted legal research to draft the papers filed in the Litigation. [TR 12:04:10-12:04:14]. The Court notes that Mr. Burnley seemed convinced, notwithstanding the Judgment and the loss on appeal, that Cadlerock was not entitled to collect from him on the underlying

---

[13] In their Amended Answer, Defendants assert that the Motion to Vacate sought to avoid collection against any personal property. [Doc 44].

22

obligation and further testified that he believed it was not entitled to a lien because it was not entitled to the Judgment.[14]

The Court acknowledges that Defendants' actions in the Litigation can be cast as them scrambling to avoid or forestall the consequences of the Judgment and the Lien through filing the Motion to Vacate, the Response, and the Memorandum in attempts to prevent the Judgment and the Lien from derailing the sale to Plaintiff.  Moreover, Defendants' behavior and litigiousness throughout this proceeding severely undermined their credibility. But as the Court has already indicated, the Court could not confidently conclude what Defendants knew and when they knew it. Thus, the Court concludes that Plaintiff failed to carry its burden of establishing that Defendants acted with the requisite fraudulent intent. As a result, Plaintiff is not entitled to judgment under § 523(a)(2)(A).

### 2.      Nondischargeability Under 11 U.S.C.  § 523(a)(6)

To prevail on a claim for nondischargeability under § 523(a)(6), Plaintiff must establish that Defendants willfully injured Plaintiff or Plaintiff's property. An injury is willful when the injury itself was "deliberate or intentional" and not merely the result of an intentional act that resulted in injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 977 (1998). Thus, "a debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1165 (11th Cir. 1995) (citations omitted).  To prove an act was done maliciously, a plaintiff need not prove that defendant had the specific intent to harm him. *Id.* In sum, to prevail under § 523(a)(6), Plaintiff must show that Defendants' fraudulent omission was intended to, or substantially certain to, cause injury but Plaintiff does not need to establish that the action was motivated by personal animus.

---

[14] See Note 5 supra.  The Huron Court determined that Cadelrock was the holder of the obligation.

Nothing in the record indicates that Defendants omitted the Litigation or the Lien with the intention of passing the cost on to Plaintiff as opposed to seeking to avoid the effect of the Judgment and their inability to post the supercedeas bond. Therefore, Plaintiff is not entitled to judgment under § 523(a)(6).

### 3.    Objection to Discharge Under 11 U.S.C. § 727(a)(4)

Section 727(a)(4)(A) of the Bankruptcy Code states in relevant part, that "[t]he court shall grant the debtor a discharge, unless-- … (4) the debtor knowingly and fraudulently, in or in connection with the case-- (A) made a false oath or account[.]" 11 U.S.C. § 727(a)(4)(A). To justify denial of a discharge under § 727(a)(4)(A) the false oath alleged must be (1) fraudulent, and (2) material. *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991). "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616, 619 (11th Cir. 1984). However, the discharge may not be denied when the untruth was the result of a mistake or inadvertence. *Beaubouef v. Beaubouef* (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992).  A false oath includes "false statements or omissions in a debtor's schedules, false statements made by a debtor during the section 341 meeting of creditors, and false statements at the debtor's deposition." *Dana Federal Credit Union v. Holt (In re  Holt)*, 190 B.R. 935, 939 (Bankr. N.D. Ala. 1996) (citations omitted).

Plaintiff alleges that Mr. Burnley's testimony at the 341 meeting was false, while Defendants argue that Mr. Burnley was confused and his testimony mistaken. [Doc. No. 42].  As the Court noted in the Order on the Motion for Summary Judgment, "[w]hether Mr. Burnley's testimony at the 341 hearing was inadvertent or intentionally fraudulent is a question that must

be determined after the Court has the opportunity to consider the credibility of witnesses and the totality of the circumstances as established by evidence at trial." [Doc. 45 at 21]. However, no evidence regarding Mr. Burnley's testimony at the 341 meeting was presented at Trial, and Plaintiff failed to show by a preponderance of the evidence that the testimony was knowingly false. As a result, Plaintiff is not entitled to judgment under § 727(a)(4)(A).

## IV.    CONCLUSION

For the forgoing reasons, the Court concludes that Plaintiff holds a claim in the amount of $77,000 but is not entitled to a judgment that the claim is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) or (a)(6). The Court further concludes the Plaintiff is not entitled to a judgment sustaining its objection to Defendants' discharge under 11 U.S.C. § 727(a)(4)(A).

The Court will enter a judgment in favor of Defendants in accordance with these findings and conclusions.

**END OF DOCUMENT**

**<u>Distribution List</u>**

Brookfield Global Relocation Services, LLC
c/o Gregory M. Taube
Nelson Mullins Riley & Scarborough LLP
201 17th Street, NW, Suite 1700
Atlanta, GA 30363

Gregory M. Taube
Nelson Mullins Riley & Scarborough
Suite 1700
201 17th Street, NW
Atlanta, GA 30363

Clifford Edward Burnley
4871 Shady Rest Drive
Powder Springs, GA 30127

Christine Annette Burnley
4871 Shady Rest Drive
Powder Springs, GA 30127